**JS-3**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| | Case No.: SACR 22-00008-CJC |
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | **MEMORANDUM OF DECISION** |
| v. | |
| **OSAMA ALLADAWI,** | |
| Defendant. | |

## I.    INTRODUCTION

The United States of America (the "Government") charged Defendant Osama Alladawi with twenty-one counts of wire fraud arising out of a scheme to defraud the U.S. Department of Agriculture ("USDA") and the California Department of Public Health ("CDPH").  (*See* Dkt. 1 [Indictment].)  Despite knowing he lacked the required

authorizations, Mr. Alladawi submitted claims for nearly $10 million[1] from the USDA and the CDPH related to a program providing food to low-income women and children. (*See* Indictment ¶ 3; Dkt. 45 [Am. Trial Stip., hereinafter "TS"] ¶ 7.)  The Court previously denied Mr. Alladawi's motion to dismiss the indictment for failure to state an offense, (*see* Dkt. 27 [Mot. to Dismiss, hereinafter "Mot."]; Dkt. 31 [Order Denying Mot. to Dismiss]), and the parties then stipulated to a bench trial.  (*See* Dkt. 33 at 2.)  The relevant facts supporting the government's indictment are not disputed, (*see* TS at 1), so the parties submitted trial briefs articulating their legal positions regarding interpretation of the wire fraud statute.  (Dkt. 42 [Def.'s Trial Memo., hereinafter "Def. Br."]; Dkt. 43 [Gov't's Trial Br., hereinafter "Govt. Br."].)  On November 29, 2023, the Court heard the parties' arguments and evidence at a short bench trial held solely to determine whether Mr. Alladawi's actions constitute wire fraud in violation of 18 U.S.C. § 1343.  Having considered the parties' trial stipulation, the government's evidence—to which Mr. Alladawi does not object, (*see* Def. Br. at 2)—both parties' briefing and arguments at trial, and cases published since the Court denied Mr. Alladawi's motion to dismiss, the Court finds Mr. Alladawi **NOT GUILTY** on all twenty-one counts of wire fraud.

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Stipulated Facts[2]

The Special Supplemental Nutrition Program for Women, Infants, and Children (the "WIC Program") provides low-income women, infants, and children who are at

---

[1] The Government does not provide evidence supporting this total—only evidence of the food instruments submitted without authorization as charged in Counts 1–21 of the indictment.  (*See* Dkt. 41-1–2 [Exs. 1–21].)  Accordingly, this allegation is referenced for context but has no bearing on the Court's decision.

[2] The parties do not submit any factual disputes for the Court's decision, but the Court includes these factual findings based on the parties' stipulation and evidence.  (*See* TS; Dkt. 41 [Gov't's Ex. List] Exs. 1–23.)

nutrition risk with nutritious foods to supplement their diets.  (TS ¶ 1.)  The WIC Program is funded and administered through the USDA's Food and Nutrition Service and the CDPH.  (*Id.*)

WIC Program benefits are administered via food instruments ("FIs"), which are negotiable instruments (like checks) that beneficiaries take to authorized WIC Program vendors to purchase authorized food items.  (*Id.* ¶ 2.)  Like any other government benefits program, there are restrictions on the use of FIs.  FIs cannot be used to purchase unauthorized food items, exchanged for cash or credit, or "[e]xchange[d] . . . at any food vendor other than the one indicated by name on the food instrument."  Cal. Code Regs. Tit. 22, § 40749(a)(1)–(2), (4).

A store owner who wishes to be an authorized vendor must sign a vendor agreement with the CDPH.  (TS ¶ 3.)  From 2007 to 2016, Mr. Alladawi operated several authorized WIC Program vendor stores and signed numerous vendor agreements.  (*Id.* ¶ 5.)  In each of these agreements, Mr. Alladawi acknowledged that a "[v]endor must not redeem a paper food instrument … outside of authorized channels."  (*Id.* ¶ 5a.)  An authorized channel is defined as "a vendor accepting a food instrument … at a vendor store authorized by its vendor agreement and associating the serial number of the food instrument … with that vendor store's vendor authorization number and then depositing the food instrument … into that vendor's bank account."  (*Id.*)  Notably, "[f]ood instruments may not be used in the repayment of debts to other parties."  (*Id.*)  In other words, WIC Program beneficiaries can redeem their FIs only at WIC Program authorized vendors, and vendors can submit requests to the CDPH for approval and payment only through the authorized vendor store at which the FIs were redeemed.  (*See id.* ¶ 5a–b.)

By October 2016, all of Mr. Alladawi's stores were either disqualified or terminated from the WIC Program or closed by Mr. Alladawi.  (*Id.* ¶ 6.)  Although he

thereafter knew he lacked authorization to participate in the WIC Program as a vendor or to accept FIs, Mr. Alladawi nonetheless obtained USDA and CDPH funds through the WIC Program through October 2019.  (*Id.* ¶¶ 7–8.)  Mr. Alladawi's scheme entailed obtaining FIs belonging to WIC Program beneficiaries and then submitting the FIs to the CDPH for approval for payment through CDPH's online portal, known as the Vendor WIC Information eXchange ("VWIX").  (*Id.* ¶¶ 4, 7.)  Mr. Alladawi needed login credentials to access VWIX.  (*Id.*)  In some instances, he submitted the FIs using his own credentials despite no longer having authorization.  (*Id.* ¶ 7a.)  In others, he submitted FIs using credentials belonging to different authorized vendor stores, which he obtained through various methods, including by posing as a WIC Program employee to dupe vendor store employees to disclose their credentials.  (*Id.*)  Once Mr. Alladawi submitted the FIs for approval through VWIX, he presented the FIs to financial institutions for payment to accounts that he owned and controlled.  (*Id.* ¶¶ 7b–c.)  Mr. Alladawi submitted the twenty-one FIs in Counts 1–21 of the indictment by means of interstate wires.  (*Id.* ¶ 7; Indictment ¶ 4.)

Though Mr. Alladawi admits to intentionally deceiving the USDA and the CDPH, there is no evidence before the Court that Mr. Alladawi did not provide approved food items in exchange for valid FIs to authorized recipients of those FIs.  In other words, the allegations focus on Mr. Alladawi's deceptive behavior as an unauthorized middleman between these FI recipients and the agencies.  The Government does not allege that any WIC Program beneficiaries did not receive what they paid for or that any FIs submitted for reimbursement were falsified.

## B. Conclusions of Law

The Government charged Mr. Alladawi with twenty-one counts of wire fraud in violation of 18 U.S.C. § 1343.  (Indictment at 1–6.)

### 1. Legal Standard

The wire fraud statute states as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.  To find a defendant guilty of wire fraud, a court must find that: (1) the defendant knowingly devised a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.  Ninth Cir. Model Crim. Jury Instr. 15.35 (2023); *see also United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) ("The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud.").  The Supreme Court has made clear that the wire fraud statute "criminalize[s] only schemes to deprive people of traditional property interests." *Ciminelli v. United States*, 598 U.S. 306 (2023) (citing *Cleveland v. United States*, 531 U.S. 12, 24 (2000)).

## 2.  Mr. Alladawi's Alleged Scheme to Defraud the USDA and CDPA

The indictment alleges that Mr. Alladawi "knowingly and with the intent to defraud" "devised, participated in, and executed a scheme to defraud the [USDA] and the CDPH as to material matters" "to obtain money and property from the United States and the State of California, by means of material false and fraudulent pretenses, representations, and promises, and through the concealment of material facts." (Indictment ¶ 2.)  It then alleges that, "for the purpose of executing the above-described scheme to defraud, [Mr. Alladawi] … transmitted and caused the transmission of [FIs] by means of wire communication in interstate and foreign commerce." (*Id.* ¶ 4.)

Mr. Alladawi does not dispute that the Government has proven most of the elements of wire fraud as to each count in the indictment.  In partial satisfaction of the first and third elements of wire fraud as identified in the Ninth Circuit Model Jury Instructions, *supra*, Mr. Alladawi "admits that in making false representations to CDPH, he acted with the intent to deceive," that he "knew that his stores were no longer authorized to receive FIs from WIC Program beneficiaries and knew that he was no longer authorized [to] redeem FIs," and that he "falsely represented to CDPH that the FIs that he sought to redeem had been received by the WIC authorized vendor whose login credentials were used to access VWIX." (TS at 5–6.)  As to the fourth element, Mr. Alladawi further admits that "these transactions, specifically the transactions in Count One to Twenty-One of the Indictment, involved the use of interstate wires." (*Id.* ¶ 7.) And based on the Trial Stipulation, Mr. Alladawi's deceptive statements were obviously material, fulfilling the second element, because they admittedly enabled him to "obtain[] money from WIC Program funds administered by CDPH" which he could not otherwise have obtained. (*Id.*)

However, Mr. Alladawi argues that the Court should find him not guilty on all counts because "there is no evidence of actual or contemplated harm or injury to WIC Program funds" and "no evidence that Alladawi intended to cheat the agencies out of WIC Program funds." (Def. Br. at 3.)  In short, Mr. Alladawi argues that because the FIs he redeemed without authorization were valid, the USDA and CDPH suffered no cognizable loss under the wire fraud statute (and that even if there was some monetary loss, he did not intend to harm the agencies in this manner)—in other words, that even though Mr. Alladawi deceived the agencies, he did not intend to deprive them of a "traditional property interest."  *See Ciminelli*, 598 U.S. at 309.  In Mr. Alladawi's interpretation, he has interfered not with the agencies' interest in their funds, but rather with their interest in regulating the WIC Program, which he argues is not a traditional property interest protected under the wire fraud statute.  (*See* Def. Br. at 4.)[3]  After hearing argument, reviewing all the evidence, and relying upon the stipulated facts, the Court agrees that the Government failed to prove beyond a reasonable doubt that Mr. Alladawi intended to cheat the USDA and the CDPA out of their money or property, the traditional property interests required to convict a defendant of wire fraud.

### i.    Review of Wire Fraud Precedents

There has long been tension regarding courts' interpretations of the breadth of fraud-based criminal statutes.  But extensive litigation of these statutes has demonstrated that "[n]ot every tort or breach of contract claim can (or should) be prosecuted as a federal crime."  *United States v. Porat*, 76 F.4th 213, 223 (3d Cir. 2023) (Krause, J., concurring).

---

[3] On these points, Mr. Alladawi incorporates his prior briefing on these legal issues in his motion to dismiss.  (*Id.* at 3.)

Over time, the Supreme Court has clearly indicated that these statutes must be interpreted narrowly.  *Ciminelli v. United States*, 598 U.S. 306 (2023), is the most recent of these cases.  In that case, "Ciminelli was convicted of federal wire fraud for his involvement in a scheme to rig the bid process for obtaining state-funded development projects …." *Id.* at 306.  Ciminelli's construction company improperly paid government lobbyists hundreds of thousands of dollars each year to help it obtain state-funded jobs. *Id.* at 310.  Ciminelli was convicted of wire fraud based on a right-to-control theory, under which the government argued that Ciminelli deprived his victim of "potentially valuable economic information necessary to make discretionary economic decisions. … Consistent with [that] theory, the District Court instructed the jury that the term 'property' in § 1343 'include[d] intangible interests such as the right to control the use of one's assets,'" which could be harmed by depriving the victim of "potentially valuable economic information." *Id.* at 310–11.  The Supreme Court rejected this right-to-control theory because "valuable economic information … is not a traditional property interest" and thus "cannot form the basis for a conviction under the federal fraud statutes." *Id.* at 306.

*Ciminelli*'s narrow interpretation of the federal fraud statutes is merely the latest in a line of cases applying this type of reading.  This trend began with *McNally v. United States*, 483 U.S. 350 (1987), "which confined the statutes to the 'protect[ion of] individual property rights.'" *Ciminelli*, 598 U.S. at 306 (quoting *McNally*, 483 U.S. at 359).  "Prior to *McNally*, federal prosecutors had been using the mail fraud (Section 1341) and wire fraud (Section 1343) statutes to attack various forms of corruption that deprived victims of 'intangible rights' of honest services unrelated to money or property," *United States v. Smith*, No. 1:17-cr-00020, Dkt. 656 at 7 (D. Guam June 3, 2022), but the *McNally* court rejected the argument that the federal fraud statutes—absent a clear statement from Congress— protected anything more than "the wronging [of] one in his *property* rights by dishonest methods or schemes …." *McNally*, 483 U.S. at 358

(emphasis added).  That same year, the Supreme Court in another case emphasized that "[t]he so-called right to control is not an interest that had 'long been recognized as property' when the wire fraud statute was enacted" and thus is not a traditional property interest contemplated under the federal fraud states.  *Ciminelli*, 598 U.S. at 306 (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)).

The Supreme Court held this line in *Cleveland v. United States*, 531 U.S. 12 (2000), again ruling that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests."  *Ciminelli*, 598 U.S. at 309 (quoting *Cleveland*, 531 U.S. at 24).  In that case, the court examined "whether, for purposes of the federal mail fraud statute, a government regulator parts with 'property' when it issues a license." *Cleveland*, 531 U.S. at 20.  Cleveland was convicted of mail fraud for making false statements in his application for a license to operate video poker machines, *id.* at 15, but the Supreme Court reversed his conviction, holding that a license is not "property," *id.* at 20.  The Supreme Court went so far as to say that it was "beyond genuine dispute that whatever interests Louisiana might be said to have in its video poker licenses, the State's core concern is *regulatory*."  *Id.* (emphasis in original).  "[T]he statute [in *Cleveland*] establishe[d] a typical regulatory program.  It license[d], subject to certain conditions, engagement in pursuits that private actors may not undertake without official authorization.  In this regard, it resemble[d] other licensing schemes long characterized by this Court as exercises of state police powers."  *Id.* at 21.

Although the government in *Cleveland* framed its case around there being a property interest in the license itself (not in the money that was diverted because of the improperly obtained license), *id.* at 12, the difference is merely semantics.  Regardless of framing, *Cleveland* and other courts clearly stand for the proposition that an agency's regulatory authority is not a property interest encompassed in the wire fraud state.  *See, e.g., Kelly v. United States*, 140 S. Ct. 1565, 1566 (2020) ("This Court has already held

that a scheme to alter such a regulatory choice is not one to take the government's property.")  "Equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities"—conduct that does not implicate a traditional property interest.  *Cleveland*, 531 U.S. at 24.  And "a property fraud conviction cannot stand when [any] loss to the victim is only an incidental byproduct of the scheme."  *Kelly*, 140 S. Ct. at 1573.

In *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992), the Ninth Circuit reversed wire fraud convictions based on the defendants' deception of manufacturers regarding the ultimate destination of purchased products.  *See id.* at 466.  The defendant was charged with a scheme to defraud American manufacturers by buying sophisticated technology, promising falsely that the purchased equipment would be used only in the United States, then smuggling the goods to countries in the Soviet Bloc.  *Id.*  The court reasoned that the manufacturers were not "defrauded of 'property' within the meaning of the statute" because they "received the full sale price for their products," and "[i]t [wa]s difficult to discern why they had a property right to such post-sale control."  *Id.* at 467.  "Fairly read, the takeaway of that case is simply that individuals might have a right to control *their* transactions" "but no right as to *later* transactions."  *United States v. Akinyoyenu*, 201 F. Supp. 3d 82, 87 (D.D.C. 2016).  And in *its* transactions, the manufacturer's "core concern," *Cleveland*, 531 U.S. at 20, was receiving fair compensation for its products, which it did.[4]

---

[4] The Sixth Circuit in *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014) reached a similar conclusion. In that case, defendant Nancy Sadler operated a pain clinic that was essentially a mass dispensary for illegally prescribed narcotics. *Id.* at 588–89.  The "government showed that Nancy lied to pharmaceutical distributors when she ordered pills for the clinic by using a fake name on her drug orders and by falsely telling the distributors that the drugs were being used to serve 'indigent' patients." *Id.* at 590.  The Sixth Circuit held that although Nancy's behavior was repugnant, "paying the going rate for a product does not square with the conventional understanding of 'deprive'" as used in the wire fraud statute. *Id.*  Again, Nancy did deceive the pharmacy about the way she would use the pills in order to

The Ninth Circuit in *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020), has further explained that "to be guilty of wire fraud, a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions.  In other words, a defendant must intend to deceive *and* cheat."  *Id.* at 1101.  In that decision, the Ninth Circuit favorably cited several other circuit's decisions holding that a defendant must intend actual harm to the victim's property to be guilty of wire fraud.  *See United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970) ("[T]he government can[not] escape the burden of showing that some actual harm or injury [to the victim's money or property] was contemplated by the schemer."); *United States v. Starr*, 816 F.2d 94, 101 (2d Cir. 1987) ("[I]t is error for a trial judge to charge a jury that contemplated harm is *not* an element of fraudulent intent."); *United States v. Lemire*, 720 F.2d 1327, 1335–36 (D.C. Cir. 1983) ("[T]here is judicial consensus about certain requisite elements of a scheme to defraud. … [T]he scheme to defraud must threaten some cognizable harm to its target.").

To recap, "the wire fraud statute reaches only traditional property interests." *Ciminelli*, 598 U.S. at 316.  Binding precedents inform this Court that: (1) a regulatory interest is not a traditional property interest, *see Cleveland*, 531 U.S. at 20; (2) an interest in valuable economic information, also known as the right to control, is not a traditional property interest, *see Ciminelli*, 598 U.S. at 316; *McNally*, 483 U.S. at 358; and (3) interference with a traditional property interest requires that the defendant contemplate harm to the victim's property or money, *see Miller*, 953 F.3d at 1101.  In essence, these cases use different words to reach the same conclusion: a defendant must intend to injure a monetary or other traditional property interest to be convicted of wire

---

obtain them, but going back to the language of *Cleveland*, the pharmacy's "core concern" of being paid fair value for its merchandise was not harmed by this deception.  *Cleveland*, 531 U.S. at 20.

fraud.  That is exactly what is missing from the Government's charges against Mr. Alladawi—there is no evidence of actual or contemplated harm to the agencies' money or property.  (*See* Def. Br. at 4; Mot. at 10.)

The Court finds the Supreme Court's "core concern" language from *Cleveland* particularly apt for understanding and applying this line of cases.  531 U.S. at 20.  The Government prosecutes Mr. Alladawi under a traditional property-harm theory, but that theory simply does not fit here.  In cases like this, where funds allocated for a particular purpose were directed to an unauthorized and deceptive recipient, distinguishing regulatory harm from monetary harm requires examining the "core concern," i.e., the substantive objective, of the agencies' funding and whether that objective was still achieved despite the alleged deception.

### ii.   Lack of Harm to Agencies' "Core Concern"

Mr. Alladawi "intended to and provided [the] USDA and CDPH exactly what [they] paid for—*i.e.*, authorized WIC Program food items to authorized WIC Program beneficiaries."  (Mot. at 13.)  Any deprivation of the agencies' control over approving vendors entitled to receive payment for the redemption of FIs and over the circumstances under which a vendor may receive payment is a deprivation of "regulatory authority" that the Supreme Court has made clear is not subject to the wire fraud statute.

The Government maintains that whether WIC Program beneficiaries received food items is beside the point, because it is the agencies that were defrauded—that lost their money to Mr. Alladawi.  The Government cites several cases in support of its view, all of which this Court finds distinguishable because they involve interferences with traditional property interests that are unlike Mr. Alladawi's interference with the USDA and CDPH's regulatory rights here.

First, in *United States v. Griffin*, 76 F.4th 724 (7th Cir. 2023), the Seventh Circuit held that the "use of false representations to obtain loan guarantees from the [Small Business Administration (SBA)] that would not have been granted if the true facts had been made known" affected "'property' as required by the wire fraud statute." *Id.* at 739. In that case, the defendants also argued that "the Government did not prove that the wire fraud scheme deprived the SBA of a protectable money or property interest" and that the government's case relied upon the theory "that the SBA has a property interest in making sure that its rules are followed." *Id.* at 737; (*compare, e.g.,* Mot. at 13–17). The government argued that its theory of the case recognized "loan guarantees … that committed the SBA to stand behind a significant portion of the loan amount in case of default" at a traditional property interest. *Id.* at 739 (citing *Pasquantino v. United States*, 544 U.S. 349, 356 (2005) ("The right to be paid money has long been thought to be a species of property.")). The court rejected the defendants' characterization of the facts and concluded that these types of "guarantees, … are most certainly 'property'" under the wire fraud statute. *Griffin,* 76 F.4th at 739. Moreover, the SBA had outlined specific purposes that its funds could be used for in support of small businesses; the *Griffin* defendants took the SBA's funding and did not use it for those authorized purposes. *See* 76 F.4th at 734. Mr. Alladawi has obtained no such guarantee that would impose a future monetary obligation on the government, nor has he frustrated the ultimate purpose of the regulations he violated.

In *United States v. Kousisis*, 82 F.4th 230 (3d Cir. 2023), the defendants defrauded the Pennsylvania Department of Transportation, the United States Department of Transportation, and the Federal Highway Administration when they submitted false documentation indicating they had complied with the federal disadvantaged-business-enterprises (DBE) program requirements, which aim to "remedy the continuing effects of

past discrimination … in contracting markets nationwide." *Id.* at 233, 241 n.64.[5]  To qualify for federal transportation funds, the defendants represented that they would work closely with a subcontractor who prequalified as a DBE, but they did not do so.  *Id.* at 234–35.  Defendants would not otherwise have qualified to submit bids for government projects.  *Id.*  The Third Circuit rejected the defendants' argument that because they aptly completed the construction project, violation of the DBE requirement did "not implicate the property interest needed to establish a § 1343 violation[.]"  *Id.* at 236.  The Court held that defendants "set out to obtain millions of dollars that they would not have received but for their fraudulent misrepresentations[,]" which clearly constituted wire fraud.  *Id.* at 240.  The agencies had set aside funds specifically to support DBEs, and the funds did not go toward that purpose.  The Third Circuit held that even though the agencies had obviously received some value from defendants' construction work, providing something of value "is no defense to criminal prosecution for fraud" when the agencies' ultimate goal (i.e., its "core concern," *Cleveland*, 531 U.S. at 20) in funding the project— supporting DBEs—was frustrated.  *Kousisis*, 82 F.4th at 242.  Unlike those defendants, Mr. Alladawi did not scheme to frustrate the WIC Program's core concern and therefore has not cognizably interfered with the agencies' money.

The Government also relies upon *United States v. Yates*, 16 F.4th 256 (9th Cir. 2016) for the proposition that "the fraudulent diversion of [agencies'] funds for unauthorized purposes certainly [can] be the basis for a conviction under" the wire fraud

---

[5] In full, the court emphasized that "the importance of DBE programs more generally cannot be understated.  DOT's DBE program strives, in part, to prevent discrimination against DBEs in the award and administration of 'DOT-assisted contracts' and to provide DBEs an equal opportunity to compete for such contracts.  49 C.F.R. § 26.1.  The agency explicitly states that the initiative aims to 'remedy ongoing discrimination and the continuing effects of past discrimination in federally-assisted highway, transit, airport, and highway safety financial assistance transportation contracting markets nationwide.' *Disadvantaged Business Enterprise (DBE) Program*, U.S. Department of Transportation, https://perma.cc/SGW8-HMET (last visited Apr. 4, 2023)."  *Id.* at 241, n.64.

statute.  *Id.* at 268.[6]  Indeed, an agency "has a property interest in its funds," which "extends to the 'right to decide how to use' those funds."  *Id.* (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)).  That interest remains even though, acknowledging *Ciminelli*, "the right to make an informed business [or lending] decision" and "the ethereal right to accurate information" cannot constitute "something of value" under the bank fraud statute.  *Id.* at 265.  In *Yates*, the "defendants' deception deprived the bank of its property rights in restructuring delinquent loans and pursuing debt collection."  *Id.* at 265.[7]  There, the court recognized a traditional property interest in a bank's use of its funds particularly "as a source of loans that help the bank earn profits."  *Id.* at 268.  To the extent the Ninth Circuit's ruling was unique to financial institutions' use of funds, it would not apply here.  But to the extent the Ninth Circuit intended its opinion, much of which is dicta, to apply more broadly, the Circuit's recognition of a "right to decide how to use" funds supports this Court's and Mr. Alladawi's interpretation of the federal fraud statutes.  It's merely another way of recognizing that there is an interference with a traditional property interest when a defendant's conduct frustrates the "core concern" of a regulation regarding the allocation of funding.  *Cleveland*, 531 U.S. at 20.

The Court understands the combined position of the Ninth Circuit and Supreme Court to be that it is not sufficient under the wire fraud statute for a victim's funds to be diverted to an unqualified party because of deception, such as licensing, *see Cleveland*,

---

[6]  Though *Yates* concerned the bank fraud statute, its language resembles that of the wire fraud statute for all purposes material to this motion, and courts look to caselaw interpreting either statute in expounding the other.  *See, e.g.*, *United States v. Poliak*, 823 F.2d 371, 372 (9th Cir. 1987) ("This reading of 18 U.S.C. § 1344 is supported by our readings of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, on which the bank fraud statute is patterned."); *United States v. Rucker*, 107 F.3d 18, at *1 (9th Cir. 1996) (unpublished table decision) (noting that the bank fraud and wire fraud statutes "should be given the same broad scope").

[7]  The court could not uphold the defendants' verdict on this basis, however, because this theory was never presented to the jury.  *Id.* at 265 (citing *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991)).

531 U.S. at 20, so long as the funds that were diverted were still used for their allocated purpose, *see Ciminelli*, 598 U.S. at 306.  But when a victim is deprived of deciding how to use that money on a substantive basis—such as when money allocated for a particular purpose does not go to support that cause because of deception—that constitutes a monetary harm.  *See Kousisis*, 82 F.4th at 236.  "[E]ven if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims 'received exactly what they paid for.  In other words, while schemes that depend for their completion on a misrepresentation of an essential element of the bargain can be federal crimes, schemes that do no more than cause their victims to enter into transactions they would otherwise avoid are not."  *United States v. Porat*, 76 F.4th 213, 227 (3d Cir. 2023) (Krause, J., concurring) (cleaned up).  In sum, for a defendant to intend to *cheat* a victim, rather than to interfere merely with a regulatory interest, the defendant must frustrate the core purpose a victim intends to effectuate through allocation of its funds.

A recent case from this Circuit in the District of Guam shares this understanding, granting a defendant's motion for a judgment of acquittal after a lengthy jury trial.  *See United States v. Smith*, No. 1:17-cr-00020, Dkt. 656 at 23 (D. Guam June 3, 2022).  In that case, the jury found the defendant guilty of twenty-six counts of wire fraud based on his scheme "as a landlord to continue to directly or indirectly receive Housing Assistance Payments ('HAP') during his tenure as legal counsel for the Guam Housing and Urban Renewal Authority ('GHURA'), despite United States Department of Housing and Urban Development ('HUD') regulation 24 C.F.R. § 982.161(a)(2) and the HAP contract's prohibition of such conflict-of-interest."  *Id.* at 2.[8]  "In the HUD Housing Choice Voucher [] program, HUD pays rental subsidies so eligible families can afford decent, safe, and sanitary housing."  24 C.F.R. § 982.1.  In short, the defendant without

---

[8] The jury also found the defendant guilty of one count of conspiracy to commit wire fraud.  *Id.* at 2.

authorization rented his properties to these agencies to provide housing for individuals in need.  But, despite this deception, "[e]vidence established throughout trial showed that the HAP payments were given in return for rental units for Section 8 tenants, and that [the d]efendant intended throughout the scheme to provide those rental units."  *Id.* at 17.  The government argued "that full compliance with the HAP contract's provisions, including its conflict-of-interest provisions, was a key and 'essential aspect of the bargain' such that GHURA or HUD did not get what it paid for."  *Id.* at 17–18.  But the district court held that "HUD and GHURA were really deprived of the truth about [the defendant's] eligibility based on an undisclosed conflict of interest," which was an interest that was "merely regulatory."  *Id.* at 18.  The organizations' core interest of providing funding for safe and affordable housing was not frustrated.  The court therefore acquitted the defendant of all twenty-six counts of wire fraud.[9]  *Id.* at 23.

Here, the stipulated facts do not suggest that Mr. Alladawi, though undoubtedly acting illegally, actually contemplated harm to a traditional property interest of the USDA and CDPH.  Yes, he schemed to obtain government funds, but the true injury was to the agencies' regulatory interest in administering the WIC Program.  The agencies' core interest, the objective of supporting indigent mothers and children's nutritional needs—i.e., the objective that would implicate the "right to decide how to use" funds, *Yates*, 484 U.S. at 26—was not frustrated.  It is not disputed that Mr. Alladawi accepted valid FIs at his stores.  The Government does not allege that any of the individuals who presented the valid FIs at Mr. Alladawi's stores were not eligible recipients of those FIs.  Nor does the Government allege that Mr. Alladawi overcharged the FI recipients for their purchases or that he accepted the FIs for items that were ineligible under the WIC Program.

---

[9] The court also acquitted the defendant of the count of conspiracy to commit wire fraud.  *Id.* at 23.

What the Government alleges is that Mr. Alladawi did all this without the required authorization and that he deceived the agencies and other vendors in submitting his claims for reimbursement.  Even Mr. Alladawi's counsel admitted at the bench trial that his conduct could easily have been prosecuted under Title VII.[10]  But "[n]ot every tort or breach of contract claim can (or should) be prosecuted [under the federal fraud statutes]." *Porat*, 76 F.4th at 223 (Krause, J., concurring).  The Government's funds covered food purchased by WIC Program beneficiaries as intended.[11]  Mr. Alladawi, thus, did not contemplate harm to a traditional property interest—only to a regulatory one, which is not covered under the wire fraud statute.[12]

---

[10] *See* 7 U.S.C. § 2021(a) (providing for disqualification and civil penalty of up to $100,000 against vendors who violate regulations); 7 U.S.C. § 2024(b) (providing for criminal penalty of up to twenty years imprisonment and $250,000 fine against anyone who knowingly uses, transfers, acquires, alters, or possesses WIC Program benefits "in any manner contrary to" the statute or regulations); *see also Liparota v. United States*, 471 U.S. 419, 425 (1985) ("We hold that in a prosecution for violation of § 2024(b)(1), the Government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations.").

[11] Though not briefed, presumably Mr. Alladawi would have needed to pay some sort of fee to register as a WIC Program authorized vendor, but any such "loss to the [USDA and CDPH would be] only an incidental byproduct of [his] scheme[,]" which cannot form the basis of a property fraud conviction. *Kelly*, 140 S. Ct. at 1573.

[12] Even if the Court felt that application of the wire fraud statute to Mr. Alladawi's case was ambiguous, "when there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language."  *McNally*, 483 U.S. at 359–60.  "[T]o the extent that the word 'property' is ambiguous as placed in § 1341, [the Supreme Court has] instructed that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."  *Cleveland*, 531 U.S. at 25.

## III.   CONCLUSION

For the foregoing reasons, the Court finds Mr. Alladawi **NOT GUILTY** on counts one through twenty-one of wire fraud.

DATED:      December 15, 2023

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

**CC:  CrimIntakeCourtDocs-SA@cacd.uscourts.gov; FISCAL; USPO, PSA**